22cv858
Judge Rebecca R. Pallmeyer
Magistrate Judge Gabriel A. Fuentes
DIRECT

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED
FEB 16 2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and the STATE OF ILLINOIS ex rel. PATRICA SASSO | § | |
| Plaintiffs, | § | CASE NO. ________ |
| v. | § | COMPLAINT FOR VIOLATION OF THE FEDERAL and ILLINOIS FALSE CLAIMS ACTS |
| MEDSTAR LABORATORY, INC., MIDWEST COVID TESTING LLC, WOODRIDGE CLINIC SC, MAYANK PATEL, RAJ PATEL, NEAL PATEL, and NAREN PATEL | § | FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |
| Defendants. | § | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff-Relator Patricia Sasso ("Sasso" or "Relator"), through her attorneys, on behalf of the United States of America (the "Government," or the "Federal Government") and the State of Illinois (the "State"), for her Complaint against Defendants Medstar Laboratory, Inc. ("Medstar"), Medstar's founder Naren Patel, Medstar's Chief Executive Officer Neal Patel, Medstar's Chief Operating Officer Raj Patel (collectively the "Medstar Defendants"); Midwest Covid Testing LLC ("Midwest Covid Testing"), and one of its investors Mayank Patel (the "Midwest Defendants"); and Woodridge Clinic SC ("Woodridge") (collectively, the Medstar Defendants, the Midwest Defendants and Woodridge are referred to as the "Defendants"), alleges as follows based upon personal knowledge, relevant documents, information, and belief:

## I. Nature of Action

1. This *qui tam* lawsuit is for damages and civil penalties in an action under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA"), and the Illinois False Claims Act, 740 ILCS 175/1, *et seq.* (the "IFCA," and together with the FCA, the "FCAs"), based on the Defendants submitting or causing to be submitted false claims for payment to Medicare, Illinois Medicaid ("Medicaid"), and the US Department of Health and Human Services' Health Resources and Services Administration's COVID-19 Uninsured Program ("HRSA Program"). This lawsuit is also for damages and civil penalties in an action under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, *et seq.*

2. This action concerns Medstar's failure to properly furnish COVID-19 PCR testing services, which are paid for, depending on the patient's insurance coverage, by either Medicare, Medicaid, the HRSA Program, or private insurers. Regardless of what is in the testing vial, whether it is a positive covid test from a patient who is actively infected by Covid-19, a positive control swab designed to elicit a positive test for quality control and training purposes, two pen caps taped together, a sterile stick, or nothing at all, Medstar persistently reports a negative PCR test result. The Midwest Defendants and Woodridge know that Medstar's testing procedures are improper, yet continue to send specimens from all 12 of Midwest Covid Testing's sites exclusively to Medstar.

3. The Defendants' scheme not only abuses government and private-insurance funds, but it also jeopardizes the health and safety of the people of Illinois. The Defendants' profiteering plays a significant role in perpetuating the spread of COVID-19, as Medstar repeatedly produces only negative PCR test results on samples submitted to it, and thus has likely produced thousands of false negatives in recent months alone, when the highly-contagious Omicron variant of COVID-19 was rampant. A false negative result from what is generally accepted as the most reliable mode

of COVID-19 testing poses serious health risks not just to the patient receiving the result, but to the general public as well. Because the false negative recipient will assume they do not have COVID-19, they will not partake in protective measures such as self-isolation, masking, and contact tracing. However, because false negative results increase the spread of COVID-19, which increases the demand for testing, the Defendants' financial interests do not align with the best interests of Illinois' public health. The Defendants do not see a COVID-19 surge as a public health crisis—they see it as an opportunity for continued financial gain.

4. Because properly-executed PCR tests are more reliable than rapid tests, many individuals take a PCR test in advance of a situation where it is especially important to be COVID-free. Examples of such situations include visiting high-risk individuals or receiving a medical procedure. Relying on a false negative result in these kinds of situations can be catastrophic, leading to severe illness or death for those individuals and the people with whom they come in contact.

5. Midwest Covid Testing offers both antigen (more commonly known as "rapid") and PCR COVID-19 testing services to the general public. When Midwest Covid Testing administers a PCR test, it sends the specimen to Medstar for a real-time reverse transcription-polymerase chain reaction (RT-PCR) test. Medstar sends the test results to the patient directly via email.

6. Sasso is the lead medical assistant at Midwest Covid Testing's Lombard location ("Lombard site"). Sasso has been a certified medical assistant for 11 years, and has worked at the Lombard site for 6 months. In her role at Midwest Covid Testing, Sasso leads the daily operations of the clinic. Sasso's responsibilities include administering rapid and PCR tests, inputting patient information, and ensuring patients have a smooth experience at the clinic.

7. The Lombard site administers approximately 50-100 PCR tests per day, although this number fluctuates in response to the number of cases in the area. During the height of the Omicron variant, the Lombard site sometimes had a daily quota of 220 tests per day, around half of which were PCR tests.

8. During her 6-month tenure at Midwest Covid Testing, despite administering PCR tests throughout COVID-19 surges caused by the Delta and Omicron variants, Sasso is not aware of a *single instance* in which Medstar produced a positive PCR test result for a patient. As described in greater detail below, Sasso's observations, personal experiences, and experiments have confirmed that Medstar's testing procedures are improper. In fact, Medstar may not conduct any testing at all—Sasso's results and observations suggest that Medstar does not even look at the incoming vials. Recognizing Medstar's fraudulent practices, many Lombard site employees, including Sasso, have sent patients elsewhere for PCR tests, or have encouraged patients to take a rapid test instead of a PCR test. Sasso has sometimes even exaggerated the turnaround time for the PCR test results in order to steer the patient towards a rapid test.

9. The dysfunction at Midwest Covid Testing is also reflected in the working conditions at the Lombard site. The Midwest Covid Testing Lombard site is rife with hazardous working conditions that violate CDC and OSHA guidance that endanger staff and patients alike.

10. Medstar alone has received over $130 million in funds from the United States' HRSA Program, despite intentionally failing to perform the testing, and/or performing the testing in an entirely inadequate manner, for which it billed and collected from the government and private insurers. The Midwest Defendants and Woodridge continue to send all of the Midwest Covid Clinic's specimens to Medstar for PCR testing despite knowing that Medstar is engaging in fraudulent activity, in order to receive illegal kickback payments from Midwest Covid Testing

amounting to 10% of what Medstar receives from the government or private insurers. This arrangement is not only illegal, but it gives Midwest Covid Testing little incentive to partner with a different laboratory, even if Midwest Covid Testing management knows or suspects that Medstar is falsifying results.

11. Defendants' conduct jeopardizes public health and violates the law. As a result of their repeated violations of the law, Defendants are liable for civil penalties, treble damages, injunctive relief, and such other appropriate relief as this Court deems just and proper.

## II. Parties

12. The United States of America and the State of Illinois are the real parties in interest to the claims of this action.

13. The United States brings this action on behalf of the Department of Health and Human Services and the Centers for Medicare & Medicaid Services ("CMS"), which administer the Medicare and Medicaid programs. The Department of Health and Human Services' Health Resources and Services Administration administers the HRSA Program.

14. The State of Illinois brings this action on behalf of its Department of Healthcare and Family Services, which administers its Medicaid program, and on behalf of the Illinois Attorney General and Cook County State's Attorney in connection with their enforcement of the Illinois Insurance Claims Fraud Prevention Act.

15. Plaintiff-Relator Patricia Sasso is an Illinois resident and United States Citizen. Through her job at Midwest Covid Testing, Relator has witnessed Medstar's fraudulent test result pattern over an extended period, including through the present time. In addition, Relator has had extensive conversations with Midwest Covid Testing management regarding Medstar's fraudulent

acts, who insist that nothing is wrong with Medstar's lab testing despite its obvious and repeated failures, instead ordering her to continue performing PCR tests and sending them to Medstar.

16. Defendant Medstar Laboratory, Inc. is a corporation organized under the laws of the State of Illinois, with its principal place of business in Hillside, Illinois. Medstar's leadership team consists of Founder Naren Patel, Chief Executive Officer Neal Patel, and Chief Operating Officer Raj Patel. Dr. James Bryant, a practicing pathologist, and Raman Patel are the Laboratory Directors at Medstar.

17. Defendant Naren Patel is an Illinois resident. Naren Patel is the founder of Medstar and father of defendants Neal Patel and Raj Patel.

18. Defendant Neal Patel is an Illinois resident. Neal Patel is Medstar's Chief Executive Officer, son of Naren Patel and brother of Raj Patel.

19. Defendant Raj Patel is an Illinois resident. Raj Patel is the Chief Operating Officer of Medstar, is the brother of Neal Patel, and the son of Naren Patel. Raj Patel and Defendant Mayank Patel have a close personal relationship, and orchestrated the illegal kickback scheme described herein.

20. Defendant Midwest Covid Testing is a corporation organized under the laws of the State of Wyoming, with its principal place of business in Illinois. Midwest Covid Testing has 12 locations: Lombard, Lemont, Woodridge, Streamwood, Park City, Bartlett, Downers Grove, Wicker Park, West Chicago, Villa Park, Joliet, and Hanover Park.

21. Defendant Woodridge Clinic is a corporation organized under the laws of the State of Illinois, with its principal place of business in Woodridge, Illinois. Woodridge Clinic operates all of the Midwest Covid Testing locations, and provides the required referring physician, Dr. Umang Patel, to oversee the locations.

22. Defendant Mayank Patel is an Illinois resident and an investor in Midwest Covid Testing. Mayank Patel coordinated with Raj Patel to orchestrate the illegal kickback arrangement between Midwest Covid Testing and Medstar. Despite full knowledge of Medstar's improper testing procedures, Mayank Patel continued to instruct Midwest Covid Testing to send all PCR testing specimens to Medstar.

## III. Jurisdiction and Venue

23. This Court has jurisdiction under 31 U.S.C. § 3730 et seq. and 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over Defendants because they transact business in this District or committed the proscribed acts in this District. This Court has supplemental jurisdiction over the state law claims under 31 U.S.C. § 3732(b).

24. Venue lies in this District pursuant to 31 U.S.C. § 3732(a), in that many of the acts complained of took place in this District and Relator resides in this District.

## IV. Background Facts and Statutory Frameworks

### A. COVID-19 Testing Coverage

25. There are multiple avenues for providers to seek reimbursement for COVID-19 testing. They can submit claims to Medicare, Medicaid, the HRSA Program, or private insurance, depending on the patient's insurance coverage or lack thereof. Regardless of payer, the clinic and lab each submit separate claims for reimbursement.

26. Midwest Covid Testing submits claims for specimen collection. These claims are comprised of the proper Evaluation and Management Services codes, which are based on the length of the encounter, whether the patient is new or established, the place of service, and other factors.

27. Medstar submits claims for the lab portion of the test, which it claims involves a real-time reverse transcription-polymerase chain reaction (RT-PCR) test to qualitatively detect the presence of SARS-CoV-2 (COVID-19) nucleic acid. This method is one of the most popular laboratory methods for detecting COVID-19.

28. When a patient shows up at a Midwest Covid Testing location, they are supposed to fill out a patient information form, which asks the patient to identify any insurance information or for the patient to check "no insurance" if applicable. Midwest Covid Testing uses a Medstar-branded patient information form. In practice, patients rarely complete the insurance information on the form, and thus the Defendants routinely treat the patients as uninsured so as to be paid by the HRSA Program. Sasso was trained by Midwest Covid Testing not to worry about even gathering insurance information from the patients.

### 1. The Medicare Program's Coverage of COVID-19 Testing

29. Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426 & 426a.

30. Medicare will only cover those services or goods that meet professionally recognized standards of health care. 42 U.S.C. § 1320C-5(a)(2).

31. Practitioners and providers are obligated to assure that the services: (1) will be provided economically and only when, and to the extent, medically necessary; (2) will be of a quality which meets professionally recognized standards of health care; and (3) will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing quality improvement organization in the exercise of its duties and responsibilities. 42 U.S.C. § 1320c-5(a).

32. Claims for payment are submitted by clinics and laboratories to Medicare on Form CMS 1500, which providers sign to certify that the claim "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment."

33. For patients enrolled in Medicare, Medicare reimburses providers for COVID-19 testing.

34. Prior to January 1, 2021, independent laboratories received $100 for high throughput COVID-19 PCR testing claims submitted to Medicare. Because of the technology involved in high throughput COVID-19 testing, it is one of the highest amounts a provider can receive for performing a PCR test. From January 1, 2021 to present, independent laboratories receive $75 per high throughput COVID-19 PCR testing claim submitted to Medicare, with a potential add-on reimbursement of $25 if the laboratory: (1) returned the result to the patient in two calendar days or less, and (2) completes the majority of their COVID-19 diagnostic tests that use high throughput technology in two calendar days or less for all of their patients (both Medicare and non-Medicare) in the previous month.[1]

**2. The Illinois Medicaid Program's Coverage of COVID-19 Testing**

35. The Medicaid program provides healthcare services for low-income and disabled individuals. It is jointly funded by the federal Government and the states, and is administered on a state-by-state basis. 42 U.S.C. § 1396, *et seq*.

36. CMS oversees the Medicaid program on behalf of the federal Government, and the Illinois Department of Healthcare and Family Services oversees the Medicaid program on behalf of the State of Illinois. The Medicaid program is generally modeled after the Medicare program.

---

[1] https://www.cms.gov/newsroom/press-releases/cms-changes-medicare-payment-support-faster-covid-19-diagnostic-testing

37. According to the Illinois Department of Healthcare and Family Services' Handbook for Providers of Medical Services at Chapter 112.6, "Each remittance advice that reports electronically submitted claims will be accompanied by the form HFS 194-M-C, Billing Certification. The provider who rendered the services and submitted the electronic claim for payment must review the remittance advice and attest to the accuracy of the information thereon by signing the billing certification."[2]

38. Most Medicaid plans cover COVID-19 testing. In the event a Medicaid plan does not cover testing, the HRSA Program reimburses the provider. The HRSA's contractor ensures there is no other health coverage available for the patient, and will retroactively offset any overpayments.

39. Prior to March 1, 2021, independent laboratories received $100 for high throughput COVID-19 PCR testing claims submitted to Illinois Medicaid. From March 1, 2021 to present, Illinois Medicaid reimburses using the same guidelines that Medicare currently uses: independent laboratories receive $75 per high throughput COVID-19 PCR testing claim submitted to Medicaid, with a potential add-on reimbursement of $25 if the laboratory: (1) returned the result to the patient in two calendar days or less, and (2) completes the majority of their COVID-19 diagnostic tests that use high throughput technology in two calendar days or less for all of their patients (both Medicaid and non-Medicaid) in the previous month.[3]

### 3. The HRSA Program's Coverage of COVID-19 Testing

40. As part of enacted legislation in response to the COVID-19 pandemic, including the Families First Coronavirus Response Act; the Paycheck Protection Program; the Health Care

---

[2] https://www2.illinois.gov/hfs/SiteCollectionDocuments/82319Chapter100PolicyCopayTitle19ChangesFinal.pdf
[3] https://www2.illinois.gov/hfs/SiteCollectionDocuments/COVID19FeeScheduleM0243M0245RatesEffective12292021Final.pdf; https://www2.illinois.gov/hfs/MedicalProviders/notices/Pages/prn210226a.aspx.

Enhancement Act; the Coronavirus Aid, Relief, and Economic Security (CARES) Act; and the Coronavirus Response and Relief Supplemental Appropriations Act (CRRSA), the U.S. Department of Health and Human Services will provide claims reimbursement to providers, generally at Medicare rates, for providing COVID-19 testing to uninsured individuals.

41. Health care providers, including clinics and laboratories, who have conducted COVID-19 testing for uninsured individuals on or after February 4, 2020 can electronically request claims reimbursement through the program, subject to available funding.

42. In order to request claims reimbursement, providers must enroll as a provider participant. When a provider first enrolls in the HRSA Program, they have to agree to the terms and conditions.[4]

43. The terms and conditions state that "The Recipient acknowledges that each time the Recipient submits such claims for reimbursement, each claim must be in full compliance with these Terms and Conditions, and submission of those claims confirms the Recipient's ongoing compliance with these Terms and Conditions."

44. Compliance with the terms and conditions requires recipients to certify "that it, or its agents, ***provided the COVID-19 Testing and/or Testing-Related Items and Services on the Recipient's claim form*** to the FFCRA Uninsured Individuals identified on the claim form; that the dates of service occurred on February 4, 2020, or later; and that all items and services for which Payment is sought were medically necessary. ***The Recipient also certifies that to the best of its knowledge, the patients identified on the claim form were FFCRA Uninsured Individuals at the time the services were provided.***" (emphasis added).

[4]https://coviduninsuredclaim.linkhealth.com/static/HRSA%20COVID-19%20Uninsured%20Program%20Terms%20and%20Conditions%20-%20Testing%20Services.pdf

45. After providers enroll as a provider participant, they can submit patient information and corresponding claims electronically, and receive payment via direct deposit.

46. Prior to January 1, 2021, the HRSA Program reimbursed at the same rate as Medicare. However, the HRSA Program did not adopt Medicare's January 1, 2021 rate change. So, the HRSA Program still reimburses laboratories at a rate of $100 for COVID-19 PCR testing claims, regardless of turnaround time.

47. At the time this complaint was filed, Medstar had received $131 million from the HRSA Program.[5] Out of all providers who have received reimbursement from the HRSA Program, Medstar has received the 12th highest amount in the country.

#### 4. Private Insurance Coverage of COVID-19 Testing

48. If a patient is on a private insurance plan, the insurer is required to cover COVID-19 testing costs without any cost-sharing requirements. The cost of the testing services varies by provider.

49. Medstar advertises $100 per test if a patient were to pay out of pocket, but because private insurers can negotiate rates with providers, the reimbursements Medstar receives may vary.

### B. Applicable Federal Statutes

#### 1. The Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b)

50. The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1972 and has been amended many times since. The AKS arose out of Congressional concern that payoffs to those who can influence health care decisions corrupt medical decision-making and result in the provision of goods and services that are medically

[5] https://data.cdc.gov/Administrative/Claims-Reimbursement-to-Health-Care-Providers-and-/rksx-33p3 (Accessed February 7, 2022. At this time, the data was last updated on February 4, 2022).

inappropriate, unduly costly, medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of Government Health Care Programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

51. The AKS prohibits any person or entity from soliciting or receiving or offering or paying any remuneration to induce any person to refer an individual for a service for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b). The statute's prohibition applies to both sides of an impermissible kickback relationship (i.e., the giver and the recipient of the kickback). The statute provides that whoever violates these prohibitions "[s]hall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both." 42 U.S.C. § 1320a-7b(b).

52. Proof of an explicit quid pro quo is not required to show a violation of the AKS.

53. The term "any remuneration" encompasses anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. 42 U.S.C. § 1320a-7b(b)(l). It includes both sums for which no actual service was performed, and sums for which some service was performed. The statute has been interpreted to cover any arrangement where even one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.

54. Underscoring the breadth of the statutory definition, the Health and Human Services Office of Inspector-General (HHS-OIG) has interpreted the term "remuneration" to cover "anything of value in any form whatsoever." *OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35952, 35958 (July 29, 1991); *see also United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, 2008 WL 5282139, at *7 (S.D. Ohio Dec. 18, 2008).

55. A monetary payment can constitute remuneration in violation of the AKS, as can referrals including a *quid pro quo* arrangement in which parties offer referrals to each other. *See United States ex rel. Kester v. Novartis Pharmaceuticals Corp.*, 41 F. Supp. 3d 323, 337-38 (S.D.N.Y. 2014).

56. Under 42 U.S.C. § 1320a-7d(b), the HHS-OIG provides guidance to providers on whether proposed business arrangements risk violating the AKS. For example, a 2014 Special Fraud Alert warned that "[a]rrangements between referring physicians and laboratories historically have been subject to abuse and were the topic of one of the OIG's earliest Special Fraud Alerts." *See* HHS-OIG Special Fraud Alert on Laboratory Payments to Referring Physicians (the "2014 Special Fraud Alert on Laboratory Payments") (June 25, 2014). https://oig.hhs.gov/documents/special-fraud-alerts/866/OIG_SFA_Laboratory_Payments_06252014.pdf. As the OIG warned, "[a]rrangements in which laboratories ... make payments to physicians that are not commercially reasonable in the absence of Federal health care program referrals potentially raise four major concerns typically associated with kickbacks – corruption of medical judgment, overutilization, increased costs to the Federal health care programs and beneficiaries, and unfair competition." *Id.* And specifically on point to the concerns raised by Relator in this Complaint, the OIG identifies the risk that illegal referral payments "may induce physicians to order tests from a laboratory that provides them with remuneration, rather than the laboratory that provides the best, most clinically appropriate service." *Id.*

57. As the OIG points out, "claims that include items or services resulting from a violation of the anti-kickback statute are not payable by Medicare and may constitute false claims under the False Claims Act, even if the items or services are medically necessary." *Id.*

58. While the 2014 Special Fraud Alert on Laboratory Payments specifically addressed fees paid by laboratories to physicians on a "per-specimen or per-patient-encounter basis" for blood-specimen collection, processing and packaging arrangements, the OIG noted that the "same principles described in this Special Fraud Alert apply to arrangements that are similar or analogous to Specimen Processing Arrangements, including arrangements under which clinical laboratories pay physicians to collect and package patients' buccal swabs …" *Id.* at n.5.

59. HHS-OIG has also addressed AKS and a laboratory's payment of per-order fees through Advisory Opinions. For example, in HHS-OIG Advisory Opinion No. 14-03 (April 8, 2014), https://oig.hhs.gov/documents/advisory-opinions/681/AO-14-03.pdf, the OIG opined that a clinical laboratory's payment of a per-order fee of $1 for each order received through a vendor's EHR system relieved the referring physician of a financial obligation, could be viewed as remuneration, and thus held the arrangement was more than a minimal risk of violating the AKS.

60. Compliance with the federal anti-kickback laws is a precondition to participation and to payment as a health care provider under Medicare. *See generally United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295 (3d Cir. 2011); *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir. 2011); *United States ex rel. Westmoreland v. Amgen Inc.*, 812 F. Supp. 2d 39, 53-54 (D. Mass. 2011) ("If providers could demand payment for claims resulting from kickback violations, then the Anti–Kickback Statute would be meaningless legislation."). The Patient Protection and Affordable Care Act of 2010 amended the AKS to make clear that violations of the AKS can subject the perpetrator to liability under the federal FCA and to clarify that no actual knowledge of the section or specific intent to commit a violation of the section is required. 42 U.S.C. §1320a-7b (g), (h). Accordingly, claims for payment for services that result from kickbacks are false or fraudulent under the FCA.

61. HHS has published safe harbor regulations that define practices that are not subject to the AKS because such practices would not likely result in fraud or abuse. 42 C.F.R. § 1001.952. However, the plaintiff need not prove as part of its affirmative case that any safe harbor does not apply. Once the plaintiff has demonstrated each element of a violation of the AKS, the burden shifts to the defendant to establish that defendant's conduct at issue was protected by a safe harbor or exception.

62. Violation of the AKS subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).

63. In addition, the Stark Law, 42 U.S.C. § 1395m, forbids a laboratory from billing Medicare and Medicaid for certain services referred by physicians that have a financial relationship with the laboratory. The AKS and the Stark Law are intended to ensure that medical providers' judgments are not compromised by improper financial incentives and are instead based on the best interests of their patients.

### 2. The Federal False Claims Act (31 U.S.C. § 3729, *et seq.*)

64. The FCA is the government's primary tool for combating fraud against the United States. It provides incentives for individuals with knowledge of fraud against the United States to disclose the information, and for the private bar to commit legal resources to prosecuting fraud on the United States' behalf. In fact, in 2009 and 2010, the FCA was amended to broaden coverage.

65. The FCA, at 31 U.S.C. § 3729(a) (2009), provides, *inter alia*, that:

> [A]ny person who
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), . . . or (G):
>
> * * *
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

66. The FCA, at 31 U.S.C. § 3729(b) (2009), further provides, *inter alia*, that:

> For purposes of this section—
>
> (1) the terms "knowing" and "knowingly"
>
> (A) mean that a person, with respect to information—
>
> (i) has actual knowledge of the information;
>
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (iii) acts in reckless disregard of the truth or falsity of the information; and
>
> (B) require no proof of specific intent to defraud.

67. The term "obligation" is defined to include "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulations, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3) (2009).

68. Additionally, a "claim" is defined under 31 U.S.C. § 3729(b)(2)(A) (2009) as:

> (A) . . . any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--
>
> (i) is presented to an officer, employee, or agent of the United States; or
>
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--
>
> (I) provides or has provided any portion of the money or property requested or demanded; or
>
> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

69. The FCA allows any person with information about a false or fraudulent claim to bring an action and share in the recovery of a civil penalty between $10,957 and $21,916 for each false or fraudulent claim, plus three times the amount of damages sustained by the United States where the false statement would have a material effect on the United States' decision to pay the false or fraudulent claim.

70. The element of materiality requires a showing that the alleged misrepresentation or omission had "a natural tendency to influence, or [was] capable of influencing, the payment or receipt of money or property." 42 U.S.C. § 3729(b)(4). The Supreme Court in 2016 reaffirmed this standard, holding that a false certification of compliance "cannot be found [to be material to the Government's decision to pay a claim] where noncompliance is minor or insubstantial." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016). However, compliance with the AKS is material to the Government's decision to pay a claim, as evidenced by the enactment of the AKS, as well as its various amendments, which demonstrate Congress'

commitment to the fundamental principle that Federal health care programs will not tolerate the payment of kickbacks and improper schemes. Thus, compliance with AKS is a material prerequisite to a provider's right to receive or retain reimbursement payments from Medicare or Medicaid or other governmental programs.

71. While no longer a jurisdictional issue under the 2010 Amendments to the FCA, to Relator's knowledge, there has been no qualifying public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e). Additionally, Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the FCA in 31 U.S.C. § 3730(e)(4)(B), and, prior to filing the Complaint, has served voluntary written disclosures to the United States and the State of Illinois of the information on which the allegations or transactions in this action are based. The allegations made in the Complaint have not been publicly disclosed in a: (i) Federal criminal, civil, or administrative hearing in which the United States, or its agent, is a party; (ii) congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media. Moreover, Relator has knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without her knowledge.

72. Paying kickbacks to doctors in exchange for referrals undermines the integrity of federal healthcare programs.

73. To Relator's knowledge, there are no prior pending complaints against Defendants alleging similar facts related to Defendants' fraudulent schemes.

74. Prior to the filing of this Complaint, Relator made substantive disclosures to the United States and State of Illinois of facts and evidence underlying the allegations in this Complaint.

75. This action is filed *in camera* and under seal pursuant to the requirements of the federal and Illinois false claims acts.

### C. Applicable Illinois Laws

76. The State of Illinois has enacted its own False Claims Act, 740 ILCS 175/1 *et seq*., which parallels the federal statute and provides comparable relief to the state for submission of false and fraudulent claims.

77. The Illinois Insurance Claims Fraud Prevention Act 740 ILCS 92/1, *et seq*., was enacted to similarly prevent the submission of false and fraudulent claims to be made on any insurance policy.

### D. Medstar and Midwest Covid Testing Fraudulent Testing Scheme

#### 1. August 2021-November 2021: Sasso observed a trickle of patient complaints regarding inconsistent PCR test results.

78. During Sasso's first few days at the Lombard site, a coworker mentioned that for specimens collected at the same time (*e.g.*, for patients requesting both rapid and PCR tests), she received a positive result from a rapid test but a negative result from a PCR test that was sent to Medstar. Sasso thought that this result, while strange, was likely a one-off anomaly. Throughout Sasso's first 3 months at the Lombard site, some patients experienced a similar test result pattern, and would complain that they received a positive result from a rapid test, but a negative result from a Medstar PCR test.

79. This outcome is unlikely to happen once, let alone as a pattern. There is a 0.07% likelihood of a false positive on Celltrion DiaTrust brand rapid tests, one of several brands frequently used at the Lombard site. On top of that, Nucleic Acid Amplification Tests (NAATs), the viral diagnostic test technique for PCR tests, are the most sensitive test method available, meaning PCR tests are the type of test least likely to yield a false negative (the chance of a false negative PCR test is just 17%).[6]

80. Some patients also mentioned a discrepancy between the Lombard site's PCR test results (which were all sent to Medstar) and PCR test results from other clinics (which were sent to other labs). When a patient raised these concerns, Sasso's supervisor Vik Mehta ("Mehta") and Mayank dismissed them by claiming that the rapid test was detecting another respiratory virus, thus producing a false positive. Based on Relator's prior training as a medical assistant in a pulmonary critical care setting, she knew that this explanation was scientifically baseless. According to an FDA report on Celltrion DiaTrust brand rapid tests, wet-testing for cross-reactivity of 31 pathogens showed no cross-reactivity with the rapid test, meaning that the presence of these 31 pathogens did not cause a positive result. Researchers used *in silico* analysis for other organisms that could not be wet-tested, and found that the chances of cross-reactivity with the rapid test ranged from "highly unlikely but cannot be ruled out" to "no cross-reactivity."[7]

81. When addressing patient concerns, a common claim by Medstar employees was, and continues to be, that the patient took a PCR test at the wrong time, and should therefore take another PCR test to be sure. This response, while profitable for the Defendants, ignores the fact

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antigen-tests-guidelines.html; https://pubmed.ncbi.nlm.nih.gov/33563629/

[7] https://www.fda.gov/media/147694/download

that when a patient takes a rapid test and PCR test at the same time, and the rapid test is positive, the PCR should virtually always be positive as well.

82. In response to these complaints and the Defendants' faulty explanations for them, Sasso began to monitor the PCR test results, and realized she had not seen or heard of a positive PCR test result from any Midwest Covid Testing site in the entirety of her first three months at the Lombard site. During this time, Sasso spoke to the manager of the Lombard, Lemont, and Woodridge sites about her Medstar concerns. The manager has access to all Medstar results for Midwest Covid Testing patients at all 12 sites, and told Sasso and a coworker that in her one year of employment with Midwest Covid Testing, she has only seen Medstar report *one* positive PCR test result.

### 2. December 2021: Sasso's personal experience with COVID-19 confirms her suspicions.

83. Sasso began to confirm her suspicions about the integrity of Medstar's PCR testing when both she and other members of her family caught COVID-19. On December 18, 2021, Sasso's son visited the Lombard site for a rapid test and a PCR test. The rapid test was positive, but Midwest reported that its PCR test was negative. The next morning, Sasso's son took another PCR test, but this time at a different testing site managed by Excel Labs, which is unaffiliated with Midwest Covid Testing and Medstar, and received a positive result. When Sasso called Medstar regarding these conflicting test results, Medstar said that the PCR test from December 18th did not detect COVID-19 because it was administered too early. However, this explanation is inadequate, as Sasso's son received a positive rapid test result at the same appointment that the "negative" PCR test specimen was collected.

84. On December 19, 2021, Sasso received a positive result from a rapid test of herself. A few hours later, she took a PCR test at the Lombard site and received a negative result back

from Midwest. For the next several days, Sasso continued to receive positive results from rapid tests and suffered from severe COVID-19 symptoms, making this negative PCR result from Midwest especially perplexing. In addition, medical professionals were so certain that Sasso had COVID-19 that they provided her with a monoclonal antibody treatment, which is only administered to patients with COVID-19.

85. On December 24, 2021, Sasso's father-in-law, Mohsen, visited the Lombard site for a rapid test and a PCR test. The rapid test was positive, but the Midwest PCR test was negative. On December 27, 2021, Mohsen received a PCR test at his dialysis center (unaffiliated with Midwest Covid Testing and Medstar), which came back positive. Sasso again called Medstar regarding these conflicting results, and Medstar provided the same explanation they provided regarding Sasso's son's situation: the PCR test from December 24 did not detect COVID-19 because it was administered too early. However, Mohsen, like Sasso's son, received a positive rapid test result at the same Lombard site appointment that the specimen for the PCR test was collected.

86. Sasso never indicated that she had any insurance when filling out the Mestar patient intake form used by Midwest Covid Testing, and thus she believes and therefore alleges that Midwest Covid Testing and Medstar billed the HRSA Program for each of the tests she submitted for herself and her family as "uninsured" patients.

### 3. December 2021-February 2022: Sasso submits experimental tests to Medstar

87. Frustrated by the apparent false negatives that she and her family members received from their Lombard site PCR tests, Sasso began submitting experimental tests to Medstar. In conducting these experiments, Sasso registered fake patients for PCR tests and sent this information to Medstar along with a vial. Sasso left the insurance information section of the patient

information form blank, and did not even select the "no insurance" option. However, Medstar never questioned the submissions. Sasso believes and therefore alleges that Medstar billed the HRSA Program for each of these tests as "uninsured" patients.

88. Sasso conducted her first experimental test on December 25, 2021. In this experiment, Sasso submitted a positive control swab to Medstar and received a negative PCR result. The positive control swab, designed for training and quality control purposes, include traces of the COVID-19 virus such that it will test positive in ordinary testing circumstances (trained staff using qualified equipment). Under no circumstance should it result in a negative finding. According to FDA-reviewed laboratory instructions, a positive control swab "should be positive... Results from PCR runs with a negative result for the positive control cannot be reported and must be retested." The instructions also provide that "If unexpected control results are obtained, results are not reported, and the samples must be retested after investigation into the source of error."[8] In other words, if a positive control swab yields a negative result, an error of some kind occurred during the testing process.

89. On December 28, 2021, Sasso submitted another test, this time sending a swab to Medstar that contained both mucus from her own nostrils (having swabbed her nostrils with the swab), and that had been rubbed together with the positive control swab for 30 seconds. Medstar provided a negative PCR test result for this swab as well.

90. Sasso was astonished by the positive control swab's false negative results from Medstar, and decided to push things further in the hope that Medstar would have some kind of quality control for its testing procedures. Accordingly, on December 29, 2021, Sasso submitted a vial filled with preservation fluid, but nothing else. Sasso expected Medstar to report an "invalid

[8] https://www.fda.gov/media/136656/download#:~:text=The%20SARS%2DCoV%2D2%20assay,specimens%20from%20individuals%20suspected%20of

specimen" result, as there was no specimen for Medstar to test. However, Medstar reported a negative PCR result for this vial as well.

91. On January 19, 2022, Sasso submitted another positive control swab to Medstar. Medstar reported a negative PCR test result for this swab, just as it did for the other positive control swabs Sasso submitted.

92. On February 3, 2022, Sasso sent only a sterile stick (the "handle" part of the swab) to Medstar, expecting an "invalid specimen" result. However, Medstar reported a "negative" PCR result for the sterile stick, which made Sasso question if Medstar staff even looked at the incoming vials, let alone performed the required testing on them.

93. On February 7, 2022, Sasso decided to assess whether Medstar staff even look at the incoming vials by submitting two clips from pens taped together with a white label. This object looked nothing like a swab and occupied the entire width of the vial. From a quick glance, Medstar clearly should have returned an "invalid" specimen result. Unbelievably, Medstar returned a "negative" PCR result for this vial as well.

94. On February 10, 2022, Sasso submitted another vial containing only preservation fluid. This time, Sasso took extra precautions to ensure that no human DNA was present in the vial. Still, Medstar returned a "negative" result rather than "invalid."

95. On the evening of February 14, 2022, in one final attempt to determine whether Medstar will ever test a sample as "positive" or even "invalid," instead of always "negative," Sasso conducted a series of three rapid tests and four PCR tests. For the rapid tests, Sasso performed one with a negative control swab, one with a sterile swab that was rubbed against a positive control swab, and one with a positive control swab that was rubbed against a sterile swab. As expected, the negative control swab produced a negative result, while both of the other rapid tests produced

a positive result. The control swabs are designed to elicit these results – Sasso's tests thus confirmed that they do, when properly tested.

96. For the first and second PCR tests, Sasso submitted positive control swabs to Medstar. At 8:02 a.m. on February 15, 2022, Medstar reported "negative" results for both of these tests. For the third PCR test, Sasso submitted a vial filled with preservation fluid, but nothing else, to Medstar. At 8:02 a.m. on February 15, 2022, Medstar reported a "negative" result for this test. For the fourth and final PCR test, Sasso submitted a sterile stick (the "handle" part of the swab) to Medstar. At 8:02 a.m. on February 15, 2022, Medstar reported a "negative" result for this test as well.

97. In addition to the experiments described above, Sasso has compared the rapid and PCR test results of Lombard site patients over the past three months. Calling Medstar is the only way for Sasso to access the results of Medstar's PCR tests of patients that visit the Lombard clinic, as Medstar typically emails results to the patient only. Over the past three months, Sasso has called Medstar to ask for the results for about 40-60 patients who received a rapid test with a positive result and also had a PCR test conducted in the same Lombard site appointment. For *all* the aforementioned patients with *positive* rapid test results, Medstar reported that they received *negative* PCR test results.

**4. Midwest Covid Testing Knows that Medstar's Testing Services are Improper**

98. On January 25, 2022, a Lombard site medical assistant contracted COVID-19. In an appointment at the Lombard site, the medical assistant received three rapid tests and a PCR test. The rapid tests each produced a "positive" result, but the Medstar's PCR test produced a "negative" result. By this point, both Sasso and the medical assistant suspected that something was very wrong with Medstar's procedures, so the medical assistant got an additional PCR test elsewhere. The

medical assistant heeded Sasso's advice and chose to receive a PCR test at a clinic unaffiliated with Midwest Covid Testing and Medstar. That PCR test produced a positive result even though the specimens for the Midwest PCR test and the other clinic's PCR test were collected just hours apart from each other.

99. As the medical assistant awaited results from her two PCR tests, Sasso texted her direct supervisor, Mehta, raising concerns that Medstar was falsifying PCR test results, stating, "I know for a fact they are falsifying there [sic] results bc I've sent positive swabs like 3 times w fake names. Negative." Mehta replied, "I don't believe that. We need to speak with them and understand their process," and then told Sasso to call Mayank regarding Medstar's process. Sasso told Mayank her concerns about Medstar, including the fact that she received negative results for the positive control swabs she submitted to Medstar. In response, Mayank told Sasso he would talk to Raj and then call her back. After speaking to Raj and Raman, Mayank told Sasso that they confirmed there was no issue with Medstar's testing processes. Rather, the conflicting results were due to one or more of the following factors: the timing of the PCR test, rapid tests detecting a different respiratory illness but producing a positive result nonetheless, or Midwest Covid Testing's swabbing technique. As discussed above, the science does not corroborate the first and second factors. As for the third factor, Midwest Covid Testing uses the same swabbing technique for both rapid and PCR tests (and that technique is sound according to medical guidance), so this factor cannot explain the conflicting results.

100. In the same conversation, Sasso mentioned a bad Google review from a Midwest Covid Testing Woodridge site patient, and said "It's not a coincidence that it happened to Farrah" and her whole family, and that she would bet Mehta "any amount of money that [the medical

assistant's test] comeback [sic] negative she's getting pcr." Right after Sasso sent that text, Mehta called Sasso and told her to delete that text because "it could get us shut down."

101. Out of fear for her job, Sasso complied and deleted her text history with Mehta. After doing so, Sasso texted Mehta "All good," which became the new, earliest text with Mehta. Multiple coworkers were present when Mehta told Sasso to delete the text, including one individual who quit her job at the Lombard site shortly thereafter out of frustration with the Medstar situation and unsafe working conditions. Weeks later, Sasso was able to recover the texts between her and Mehta that she had been required to delete from her phone.

102. When Sasso has raised her concerns about Medstar with Mehta, which she has done on multiple occasions, Mehta has indicated that he is not aware of any improper testing procedures at Medstar, and that Mayank is responsible for Midwest Covid Testing's relationship with Medstar.

103. Midwest Covid Testing is well aware of Medstar's persistent "negative" results from other sources as well. For example, it has replied to Google reviews about conflicting COVID-19 test results. At the end of January 2022, a patient posted a review about her experience at the Midwest Covid Testing Woodridge site. The patient wrote, "I'm not sure how accurate their testing is," and explained that she was confused by "two pcr tests taken on the same day with different results," as her Midwest Covid Testing PCR test came back negative but her rapid PCR test from an urgent care clinic came back positive. The response, from Midwest Covid Testing's owner, apologized "for the confusion on the the [sic] testing. We usually do not have issues with our testing, but please contact us at support@midwestcovidtesting.com and we can discuss your results."

104. Medstar has also received scathing Google reviews about conflicting COVID-19 test results. At the end of January 2022, a patient posted a review of Medstar. The patient wrote

that on January 19, 2022, his daughter had a rapid and PCR test performed at Midwest Covid Testing's Woodridge site. His daughter's results were positive for the rapid test but negative for the PCR test, and "immediately upon receiving this news," his daughter took several at-home rapid tests, all of which gave a positive result. Additionally, on January 21, 2022, the patient took his daughter to another clinic (SMS Medical) for a PCR test, which produced a positive result. While Medstar did not respond to this Google review, the patient explained that he "called MedStar labs directly and spoke to a lab technician who was great and understanding of the issue. He transferred me to a manager who basically told me that I was wrong and my daughter was negative. She took down my information but I doubt I will hear anything back from them."

### 5. Implications of the Defendants' fraudulent scheme

105. The Defendants' fraudulent scheme has broad public health consequences, as the abundance of false negative PCR test results perpetuates the spread of COVID-19. Some patients rely on their PCR test results when visiting nursing homes, traveling abroad, or undergoing medical procedures. The Medstar Defendants are well aware that patients receive PCR tests in advance of situations that require heightened COVID-19 precautions. For example, when a patient needs an expedited test result, Sasso will write "STAT" on the patient information form, and describe why the patient needs a quick turnaround (surgery, travel, etc). In the event the Medstar PCR test results in a false negative, the repercussions can be far-reaching and fatal.

106. Sasso knows of a Lombard site patient who received a PCR test in order to be cleared for her open heart surgery. The patient received a false negative PCR test result from Medstar, and proceeded with the surgery. COVID-19 caused complications during the surgical procedure, and the patient was on a ventilator for several weeks. In addition, this patient may have exposed medical staff to COVID-19.

107. On several of the test vials that Sasso sent to Medstar in January and February 2022, she similarly wrote "STAT" and explained the urgency of the supposed testing scenario, including the patient's requiring it for surgery, travel or visiting elderly relatives. Nevertheless, as reflected above, Medstar returned "negative" results for each test, thus falsely assuring these (fortunately fake) patients that they were safe to engage in these dangerous activities when there were not.

### 6. Midwest Covid Testing and Medstar abused HRSA Program Funds by not even attempting to determine if a patient had insurance

108. Per the terms and conditions of the HRSA Program, providers must certify to the best of their knowledge that the patient is uninsured.

109. To satisfy this certification, Midwest Covid Testing would need to examine reported insurance information and identify the available insurance on the patient testing request forms so that insurance would be billed or the claim would be submitted to and paid by the federal government under the HRSA Program.

110. Midwest Covid Testing and Medstar repeatedly certified that patients were uninsured when in reality, they had insufficient information to make that determination. For instance, Midwest Covid Testing and Medstar did not perform any follow-up when important parts of the patient intake form, such as insurance information, were left blank.

111. Without requiring that a patient's insurance information had been certified before submitting the claim to the federal government, Defendants were misrepresenting to the federal government that Midwest Covid Testing and Medstar patients with private or public insurance were actually uninsured.

### 7. Defendants' Illegal Kickback Scheme

112. Pursuant to provider agreements and claim forms, providers who participate in a federal health care program generally must certify that they have complied with all applicable federal and State rules and regulations, including applicable anti-kickback statutes.

113. A man named whose first name is Henry, last name unknown, helps Midwest Covid Testing manage its financial information, including keeping track of how much money the Midwest Defendants are receiving in kickbacks from the Medstar defendants. Henry has a close personal relationship with Mehta and Mayank.

114. Sasso has heard Henry, Mehta, and Mayank discuss a kickback arrangement among the Midwest Covid Testing Defendants and Medstar Defendants. For each specimen Midwest Covid Testing submits to Medstar, Medstar pays Midwest Covid Testing 10% of what it receives from the government or from private insurers. In addition to violating the AKS and the Stark Law, this arrangement gives Midwest Covid Testing little incentive to partner with a different laboratory, even if Midwest Covid Testing management suspects or believes that Medstar is falsifying results.

### 8. Midwest Covid Testing's other public health violations

115. Midwest Covid Testing employs hazardous working conditions at the Lombard site. For example, Midwest Covid Testing used the Medstar negative PCR test results to require that Sasso and other Midwest Covid Testing employees who had COVID-19 show up to work despite having repeatedly tested positive using rapid tests for multiple days, and displaying flu-like symptoms consistent with having COVID-19.

116. On November 18, 2020, the CDC Division of Laboratory Systems issued a Lab Advisory: Waste Management Guidance for Sars-CoV-2 Point-of-Care Testing.[9] According to the CDC, "[w]hen disposing of waste generated from Sars-CoV-2 point-of-care testing, laboratories and testing sites should treat all waste from suspected or confirmed COVID-19 patient specimens and kit components as biohazardous waste." Further, CDC instructs that "[d]isposal must comply with all applicable local, regional, national and international regulations. Personnel should follow guidance according to federal, state, local, tribal, and territorial requirements."

117. The Lombard site has improper procedures for disposing of biohazardous waste, including swabs containing the COVID-19 virus. In fact, the Lombard site does not utilize any biohazardous waste containers. Sasso has never been able to dispose of any biohazardous waste in a safe manner, and has never seen a biohazardous waste company collect any biohazardous waste from the Lombard site.

118. "Electricity has long been recognized as a serious workplace hazard. OSHA's electrical standards are designed to protect employees exposed to dangers such as electric shock, electrocution, fires, and explosions." https://www.osha.gov/electrical. OSHA warns that the "normal wear and tear on extension and flexible cords at your site can loosen or expose wires, creating hazardous conditions." https://www.osha.gov/electrical/hazards. In violation of OSHA safety standards, the Lombard site's outdoor tented area has exposed wires near puddles and propane heaters, which endanger staff and patients alike.

[9] https://www.cdc.gov/csels/dls/locs/2020/waste_management_guidance_for_sars-cov-2_point-of-care_testing.html

## V. Claims

**Count II: False Claims Act**
**31 § U.S.C. 3729(a)(1)(A)**
**Against the Medstar Defendants**

119. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this complaint.

120. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

121. By and through the acts described above, the Medstar Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval. Specifically, Medstar has submitted, and continues to submit, claims to the HRSA Program and other government health care programs, requesting payment for services provided to patients Midwest Covid Testing referred to Medstar for PCR testing. Those claims are tainted, and thereby false, because of the illegal kickbacks that the Medstar Defendants provided to the Midwest Covid Testing Defendants to induce Midwest Covid Testing to refer patients to Medstar.

122. Thus, each time the Medstar Defendants caused a claim for its RT-PCR COVID-19 test to be presented to a federally-sponsored healthcare program, the Medstar Defendants caused the submission of a false claim to the United States.

123. The claim also was false because payment was directly caused by the Medstar Defendants falsely stating that the testing services were performed.

124. The Medstar Defendants knew that the claims for Medstar's RT-PCR COVID-19 testing services were false when submitted because the Medstar Defendants directed the illegal scheme that was premised illegal kickbacks and on false and fraudulent claims.

125. By virtue of the acts described above, the Medstar Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

126. By virtue of the acts described above, the Medstar Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

127. By virtue of the acts described above, the Medstar Defendants knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

128. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by the Medstar Defendants, paid and continues to pay the claims that would not be paid but for the Medstar Defendants's illegal conduct or if the Government knew the truth.

129. The Medstar Defendants' fraudulent conduct was material to the Government's decision to reimburse Defendants for claims submitted.

130. By reason of the Medstar Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

131. Additionally, the United States is entitled to the maximum penalty of up to $21,916 for each and every violation alleged here.

**Count II: False Claims Act**
**31 § U.S.C. 3729(a)(1)(A)**
**Against the Midwest Covid Testing Defendants and Woodridge**

132. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this complaint.

133. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

134. By and through the acts described above, the Midwest Covid Testing Defendants and Woodridge have knowingly presented or caused to be presented false or fraudulent claims for payment or approval. Specifically, Midwest Covid Testing has submitted, and continues to submit, claims to the HRSA Program and other government health care programs, requesting payment for services provided to patients Midwest Covid Testing referred to Medstar for PCR testing. Those claims are tainted, and thereby false, because of the illegal kickbacks that the Medstar Defendants provided to the Midwest Covid Testing Defendants to induce Midwest Covid Testing to refer patients to Medstar.

135. Each time Midwest Covid Testing, under the supervision of Woodridge, caused a claim for specimen collection to be presented to a federally-sponsored healthcare program, Midwest Covid Testing caused a submission of a false claim to the United States.

136. The claim also was false because payment was directly caused by Midwest Covid Testing's representation that the specimen collected would be tested for COVID-19.

137. The Midwest Covid Testing Defendants knew that the specimen collection claims were false when submitted because Midwest Covid Testing management knew that the specimens it collected and sent to Medstar would be subject to improper testing procedures.

138. By virtue of the acts described above, the Midwest Covid Testing Defendants and Woodridge knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

139. By virtue of the acts described above, the Midwest Covid Testing Defendants and Woodridge knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

140. By virtue of the acts described above, the Midwest Covid Testing Defendants and Woodridge knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

141. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by the Midwest Covid Testing Defendants and Woodridge, paid and continues to pay the claims that would not be paid but for the illegal conduct of the Midwest Covid Testing Defendants and Woodridge.

142. The fraudulent conduct of the Midwest Covid Testing Defendants and Woodridge was material to the Government's decision to reimburse the Defendants for claims submitted.

143. By reason of the acts of the Midwest Covid Testing Defendants and Woodridge, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

144. Additionally, the United States is entitled to the maximum penalty of up to $21,916 for each and every violation alleged here.

**Count III: False Claims Act**
**31 U.S.C. § 3729 (a)(1)(C) (2009)**
**<u>Against all Defendants</u>**

145. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

146. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

147. By and through the acts described above, the Midwest Covid Testing Defendants, Woodridge, and Medstar Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval. Specifically, Midwest Covid Testing (under

Woodridge's supervision) and Medstar have submitted, and continue to submit, claims to Medicare, Medicaid, and the HRSA Program requesting payment for COVID-19 testing services. Those claims are tainted, and thereby false, both because Medstar's COVID-19 testing procedures are improper and because of the illegal kickbacks that the Medstar Defendants provided to the Midwest Covid Testing Defendants and Woodridge.

148. The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not have been paid if the Government knew the truth.

149. The Defendants' acts described above constitute a conspiracy to violate the Federal False Claims Act. As a result of that conspiracy, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

150. Additionally, the United States is entitled to treble damages and the maximum statutory penalty of up to $21,916 for each and every violation alleged herein.

**Count IV: Illinois False Claims Act**
**Against all Defendants**

151. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

152. The IFCA provides, in relevant part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;...
>
> (C) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government,

(D) is liable to the State for a civil penalty of not less than $5000 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person. 740 ILCS 175/3(a)(1).

153. The term "knowingly" means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require[s] no proof of specific intent to defraud." 740 ILCS 175/3(b)(1).

154. Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Illinois false or fraudulent claims for payment or approval in violation of 740 ILCS 175/3(a)(l)(A).

155. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 175/3(a)(l)(B).

156. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Illinois, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Illinois in violation of 740 ILCS l 75/3(a)(l)(G).

157. The State of Illinois, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

158. The State of Illinois has been damaged by Defendants' acts, and continues to be damaged, in a substantial amount to be determined at trial.

159. Additionally, the State of Illinois is entitled to treble damages and the maximum statutory penalty for each and every violation alleged herein.

**Count V: Illinois Insurance Claims Fraud Prevention Act**
**740 ILCS 92/1, *et seq.***
**Against the Medstar Defendants**

160. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

161. This count is brought to recover treble damages and civil penalties under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, *et seq.*

162. 740 ILCS 92/5(b) provides that:

> A person who violates any provision of this Act, Section 17-8.5 or Section 17-10.5 of the Criminal Code of 1961 or the Criminal Code of 2012, or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance. The court shall have the power to grant other equitable relief, including temporary injunctive relief, as is necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public. The penalty prescribed in this subsection shall be assessed for each fraudulent claim upon a person in which the defendant participated.

163. Accordingly, under the ICFPA, a violation of Article 46 of the Criminal Code is insurance fraud. Article 46 of the Criminal Code of 1961 (located at 720 ILCS 5/17-10.5, effective July 1, 2011), provides that:

> A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.

164. The Medstar Defendants violated 720 ILCS 5/17-10.5 in that they repeatedly submitted or caused to be submitted fraudulent claims for payment for its RT-PCR COVID-19

testing services to private insurance companies in Illinois. The claims were fraudulent because the listed services were not actually performed.

165. The Medstar Defendants submitted or caused to be submitted false claims in the manner described above with the intention to deprive insurance companies permanently of the payments made on those claims.

166. The false claims submitted or caused to be submitted by the Medstar Defendants were material in that private insurers would not have paid those claims had they known that the services listed were never provided.

**Count VI: Illinois Insurance Claims Fraud Prevention Act**
**740 ILCS 92/1, *et seq.***
**Against the Midwest Covid Testing Defendants and Woodridge**

167. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

168. This count is brought to recover treble damages and civil penalties under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, *et seq.*

169. 740 ILCS 92/5(b) provides that:

> A person who violates any provision of this Act, Section 17-8.5 or Section 17-10.5 of the Criminal Code of 1961 or the Criminal Code of 2012, or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance. The court shall have the power to grant other equitable relief, including temporary injunctive relief, as is necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public. The penalty prescribed in this subsection shall be assessed for each fraudulent claim upon a person in which the defendant participated.

170. Accordingly, under the ICFPA, a violation of Article 46 of the Criminal Code is insurance fraud. Article 46 of the Criminal Code of 1961 (located at 720 ILCS 5/17-10.5, effective July 1, 2011), provides that:

> A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.

171. The Midwest Covid Testing Defendants, as operated by Woodridge, violated 720 ILCS 5/17-10.5 in that they repeatedly and knowingly caused to be submitted fraudulent claims for payment for Medstar's improper RT-PCR COVID-19 testing services to private insurance companies in Illinois. The Midwest Covid Testing Defendants and Woodridge knew that Medstar's testing services were improper, yet continued to send specimens to them for testing.

172. The Midwest Covid Testing Defendants and Woodridge submitted or caused to be submitted false claims in the manner described above with the intention to deprive insurance companies permanently of the payments made on those claims.

173. The false claims submitted or caused to be submitted by the Midwest Covid Testing Defendants and Woodridge were material in that private insurers would not have paid those claims had they known that the services listed were never provided.

## VI. Prayer for Relief

WHEREFORE, Plaintiff-Relator Patricia Sasso requests that judgment be entered against Defendants Midwest Covid Testing LLC, Woodridge Clinic, Medstar Laboratory, Inc., Mayank Patel, Raj Patel, Neal Patel and Naren Patel, ordering that:

A. Defendants cease and desist from violating the federal False Claims Act, 31 §§ U.S.C. 3729, *et seq*. and the Illinois False Claims Act, 740 ILCS 175/1, *et seq*.;

B. Defendants pay an amount equal to three (3) times the amount of damages the United States and State of Illinois have sustained because of Defendants' actions, plus a civil

penalty against Defendants for each violation of 31 § U.S.C. 3729, 740 ILCS 175/3 and 740 ILCS 92/1;

C. Plaintiff-Relator be awarded the maximum amount allowed pursuant to 31 § U.S.C. 3730(d), 740 ILCS 175/4(d)(1) and 740 ILCS 92/1;

D. Plaintiff-Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 § U.S.C. 3730(d) and 740 ILCS 175/4(d)(1); and

E. The United States, the State of Illinois, and Plaintiff-Relator be granted all such other relief as the Court deems just and proper.

## VII. Demand for Jury Trial

A. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator Patricia Sasso hereby demands a trial by jury.

Dated: February 16, 2022

PATRICIA SASSO

By: ______________________
One of Her Attorneys

David J. Chizewer
Roger A. Lewis
David E. Morrison
Goldberg Kohn Ltd.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
david.chizewer@goldbergkohn.com
roger.lewis@goldbergkohn.com
david.morrison@goldbergkohn.com

***Attorneys for Plaintiff-Relator***

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America and the State of Illinois ex rel. [UNDER SEAL] | § | |
| Plaintiffs, | § | CASE NO. ________________ |
| v. | § | |
| [UNDER SEAL] | § | FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |
| Defendants. | § | **DO NOT PLACE ON PACER** |
| | § | **DO NOT PLACE IN PRESS BOX** |
| | § | **JURY TRIAL DEMANDED** |

**COMPLAINT**

FILED

FEB 16 2022 DB

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT